Good morning, Your Honors. Good morning. May it please the Court, my name is La'Ron Baker, and I represent the appellant, Working Washington. Working Washington is a broad-based coalition including neighborhood, civil rights, labor, and religious organizations which seek to advocate for and raise awareness regarding issues affecting low-wage earners in Washington. I'd like to reserve five minutes for rebuttal. Okay. The issues before the Court are, one, whether Working Washington's message can be excluded under Section 3.3b's definition of political. Two, whether severed from Section 3.3b, Section 3.3a is an appropriate basis for excluding Working Washington's message. And three, whether injunctive relief is available to Working Washington. The District Court did ultimately rely on a, did it not? It did. The District Court found that Sound Transit could reasonably exclude Working Washington's speech as either political or controversial under 3.3a, even though in its holding, in its ruling, it found that when it analyzed whether or not the policy sufficiently constrained an administrator's discretion, the District Court relied on Section 3.3b's 18 specific, detailed, and defined definitions of speech restrictions. So what is wrong with relying on b as in peri materiae or other legal doctrines about looking at the whole document, the whole statute to give meaning to one phrase? Well, I believe that looking at the policy as a whole, Section 3.3a and Section 3.3 together, create an effective system to discrain an administrator's discretion to determine what can and cannot be excluded from the form. It defines what is political and to be excluded, and it defines what is religious and 16 other categories. I think what's problematic is the District Court looked at Section 3.3b and said that, yes, because of Section 3.3's definition, this policy sufficiently protects against viewpoint discrimination and provides for reasonable basis for judicial review. But when it severed 3.3b from Section 3.3a and said, even though 3.3b defines political in a narrow way that cannot be construed as excluding work in Washington speech, 3.3a's generalized exclusion of speech that is political or controversial without the limiting factor of 3.3b is too much of a grant of discretion for administrators. Did B say these are the only examples, or did B just simply give some examples? B said that these are the excluded, these are the categories of speech to be excluded. So the following restrictions to any advertisement on or at its facility sound, and that's the kind of broad intro to 3.3. 3.3a talks about a generalized intent. And then 3.3b says the following forms of paid or unpaid advertisement will not be permitted for placement or display on sound transit facilities, buses, or rail vehicles. Pardon me for interrupting. I'm looking for a full copy of the policy. It's at ER 70. 70. Yeah, it begins at 70. ER 72 is where the definition of political is. ER 70, not SDR. ER 70.  Thanks. Excellent. So to continue that answer, 3.3a, as a whole, 3.3a and 3.3b can be read as a reasonable limitation on speech in a limited public forum. However, 3.3a alone, in its general ban on controversial and political material, is unworkable. One, because Arizona Life and Hopper, via the city of Pasco, have recluded an argument that an exclusion on controversial speech without further definition sufficiently constrains an administrator's discretion and protects against viewpoint discrimination. And, two, the term political without further definition is so broad and subjective that it, too, should be an impermissible grounds for exclusion of speech on the same grounds and the same reasoning as controversial is. How do you distinguish the Lehman case? Lehman does allow for restrictions on controversial speech. And in Lehman, the court upheld a ban on non-commercial speech and allowed for anything that was commercial and public interest. The court did not go into a further analysis about how a transit advertising agency may permissively restrict controversial speech, although it does say generally controversy is grounds that address. Right, right. But the court did not address the appropriate means by which a restriction on these types of speech may occur. And courts have generally upheld, Children of the Rosary is another case, categorical restrictions on speech, on the types of categories of speech that are likely to have controversial messages in it. Well, I'm just uncertain. I mean, sure, Lehman didn't address every known fact pattern you could imagine, but it seems pretty generally to give a fair amount of discretion on controversial topics to be regulated by mass transit companies. It does say that a transit agency can restrict controversial speech. However, this court has found that terms like controversial are too subjective without further guidance for an administrator to be a workable definition of a category of speech that can be restricted. In Hopper v. Pascoe. Do you think there's no reasonable argument that could be made that the speech that you are seeking is controversial? I believe that there is a strong argument that the speech that we are seeking is not controversial. It's not? I believe that Sound Transit ran another working Washington ad that addressed the same subject matter, low-wage earners. Put the comparison aside for just a minute. That's a totally different argument, I think, but a legitimate argument. I'm not saying it's not legitimate. It's just not the thing I'm going to focus on at the moment. I don't understand whether you're thinking that this is just plain couldn't be legitimately construed as a controversy or that it could be legitimately construed as a controversial item. Well, Your Honor, it could be construed as controversial, just as almost anything can be construed as controversial, no matter what the topic is. Someone who loves the Mariners and says, go Mariners, that speech could be deemed controversial by someone who does not agree with that. That's the problem with using these kind of broad definitions that are, in the end, are subjective. What is controversial to one person may not be controversial to another. And so I think there are some things that are more likely to be deemed controversial by many people, but not by all. And just as a standard by which to restrict speech, such a subjective term, one, doesn't cabin discretion sufficiently, two, doesn't give notice to speakers who wish to engage in a speech activity in this form, whether or not their speech will be included or excluded, and three, makes it difficult for judicial review. The nature of this appeal, the position of it, makes it more difficult for you. Eventually, you could get a trial, and we could flesh all this stuff out. But you're making it very hard for yourself by appealing the denial of a mandatory preliminary injunction. You have two pretty serious evidentiary concerns. One, it's a mandatory injunction, and secondly, that it is a preliminary injunction, so we review the court ordinarily under abuse of discretion standard, and then we top onto that all of the biases against mandatory preliminary injunctions. Why doesn't this case just proceed to trial? Right now, it's got a stay in it. Why didn't it just make more sense to say those are insurmountable problems at this stage, but let's get the trial and see how it fleshes out? Well, Your Honor, our working Washington has been suffering irreparable harm and a constitutional violation from having its speech silenced and censored for over a year. There's no doubt that a First Amendment violation gives you a big leg up on irreparable harm, but there are four prongs to be justified, and your constitutional violation only helps you with one of those prongs, that is the irreparable harm. You still have three other prongs, including likelihood of success on the merits, balance of harm, and so forth. We believe that we have a very strong likelihood of success on the merits, and the balance of harm weighs in favor of our client, working Washington, who has been constrained from being able to engage in speech that we believe constitutes a First Amendment violation. And so their mission, their entire purpose of their organization and one part of their work, they're unable to engage in in the way that they have identified is the best possible means, whereas Sound Transit has produced no evidence in the record other than bald assertions that there would be any problem with running an ad that advocates for or raises awareness around low-wage hiring. How long has this case been stayed? This case was stayed soon after the district court's decision. Roughly how many months, years? Months. So the order was issued a couple, two days before July 4th. I think it was July 2nd, maybe July 1st of 2012. The stay, I think, went into effect a month or so after that. But I'm uncertain. That's fine. That's good enough. Thank you. I see. Do you want to say the rest of your time? If you've got something else you want to say preliminarily, you go ahead. I do want to, actually, I will save my time for rebuttal. Thank you. Good morning, Your Honor. Paul Lawrence for the Central Puget Sound Regional Transit Authority, or as more commonly known as Sound Transit, which I'll refer to. The issue here is whether Sound Transit can rely on its policy, which is backed up by its practice, that restricts advertising on its light rail cars in King County. The agency here is acting in its proprietary capacity to run a public transit system. By policy and practice, it has limited the advertising on its facilities and on its cars, specifically designating them as a limited non-public form for the benefit of its customers and for its revenues. It has determined to exclude certain categories of speech and has done so in a rather more detailed than typical policy and has applied that policy to reject on the record at least four ads in the little over a year period that was before the court ruled. Well, the primary argument that seems to me bothersome is that the guidance in the statute, particularly in subsection A, which I gather is really relied upon, is insufficient. That is, it leaves too much discretion to you to decide. So position of neutrality on political, religious, and controversial matters. Now, if the definition of political were limited to what's described as political in B, I think maybe it would be an easier and more constrained definition to defend. But here, political is such a broad term, or at least seems potentially so broad, how do you respond to the charge that this insufficiently channels the discretion of your agency? And as part of that, could you tell me why this ad is different from the ad accepted from Working Washington that says we like infrastructure, we like bridges, we like good-paying jobs, stand up for good-paying jobs. I paraphrase, but that's basically the ad. That's multiple questions. It's all part of the same abuse of discretion channeling through the policy. Let me start by saying that I think, first of all, as Judge Eagle pointed out and Judge Kunauer ruled, the 3.3 factors, the examples, are something that inform the 3.3A. I think, first of all, you should look at the way the policy is structured. I got that part. And you'll see that 3.3A and B are both intended to be restrictions on ads. I got that part. So there's more here than is actually typically found in terms of trying to define and help guide the discretion of the decision-maker. Secondly, we would point you to the most recent decision that we filed as a supplemental authority out of the Sixth Circuit, the Smart Case, which actually directly head-on addressed whether the term political in and of itself is too vague to be applied by a transit agency to reject ads. And the Sixth Circuit held unequivocally that the term political was sufficiently objective and reasonable to allow a transit agency to act. So we have a specific holding. Let me put this down to a fine point on the question. Why is the ad about good-paying jobs and infrastructure not political? Obviously trying to get something different from where we now are. I think that, sure. It's not controversial, but it sounds political. Well, I think there are differences, and then let me talk about the theory about why the differences, you don't have to be too exacting in your evaluation of those differences. The difference here is that the Working Washington ad that was rejected, the added issue here, was part of a campaign to advocate for a particular result, including a petition to the Port of Seattle to change their policies as respect to working conditions at SeaTac Airport. In other words, it was part of a political campaign to affect policymakers, to affect working conditions. The Bridge ad is a generic ad supporting good infrastructure products. There was no campaign to affect any policymakers. There was no issue at all in the community at the time about building bridges or whether a particular bridge was going to be built with union labor or not. Those type of specifics might have raised that ad to a political ad. So what evidence is there in this record about this ongoing controversy over wages, that is, the ongoing negotiations and debate about the size of wages there on the transit authority? Well, I think that it's, A, it's admitted. Well, it's not the transit authority wages that are the issue. No, no, I know. I mean, that's right. But operating it, yeah. Well, I think it's admitted in the declarations that were filed in support of the motion for preliminary injunction as to what the intent of the ads were, that is, they were part of a campaign to educate and further inform. I'm sorry. If you're going to just quote for me or refer specifically to your best evidence in the record, that shows that this topic of the wage levels was currently a matter of some controversy, what piece of evidence would you refer to? In terms, well, as I said, I will need to get to the citation. Well, don't give me the citation. Just summarize it. There's a declaration of the executive director, I believe, of Working Washington, who explained what the purpose of the ad was. And the purpose of the ad was to address a particular problem at SeaTac Airport to raise awareness as part of a campaign that was to involve both picketing and petitioning. And was that campaign ongoing at the time? It was just starting at the time. But it was threatened or it was on a negotiating table or at least known? It was known. Is there something in the record to show that? There's not a threat of a labor strike at issue. No, no. I don't think it went that far. Right. I just want to know what the record was before Judge Conower about whether the wage rates was, at that time, a matter of some controversy. The record is, as I said, the declaration that was submitted by the Working Washington and also the response that was submitted by the General Counsel of Sound Transit in response as to why they were rejecting the ad that indicated that Sound Transit had reviewed the ad and reviewed the website related to the campaign and that it indicated that there was active petitioning and organizing, I'm sorry, and asking Alaska Airlines to change position. That's in the declaration. So that declaration said that there was ongoing picketing, ongoing what? What the declaration said is it attached the communication from Mr. Brown, as the General Counsel of Sound Transit, to the Executive Director of Working Washington, explaining why his ad was being rejected. And as part of that explanation, it referenced materials that were in the website of the organization related to the ad that the ad pointed to and said, you know, petition, here's a petition to click on. It referenced activity before petitioning before the Port of Seattle Commission. Okay. All right. Thank you. I think that to go back to the final point of the question is that, and this was pointed out in the Sixth Circuit in the decisions that we cited in supplemental authority and also recognized by Ridley in other cases and actually by the Supreme Court implicitly in Lehman and the Cornelius case is that these decisions as to what is political or not, what is controversial or not, always involve some degree of discretion. And so you're never going to have a situation where there is no discretion that can be exercised. The question is whether or not it's a reasonable exercise of discretion. And the Sixth Circuit particularly pointed out that you can't nitpick just because you might disagree with one choice. In that case, there was allowing an atheist organization to place an ad, but they did not allow an organization that was sort of anti-jihadist, you know, that was against the notion of Islamic law being imposed in the United States. That that, you know, picking on one particular example does not undermine the fact that there is a reasonable exercise of discretion which there was here based on a rather more detailed policy than was even a fact in the decision in the Sixth Circuit. You know, I'm reading a letter from your general counsel, Mr. Brown, to Mr. Rosenblum, explaining why the ad was rejected. I might suggest to your general counsel that this following sentence was not a very well-advised sentence given the nature of the First Amendment challenge on controlling of discretion. He writes, as a consequence, sound transit has broad discretion under the law to reject advertising if its judgment fails to maintain a safe and welcoming environment. Your argument, if you're going to win, is that you don't have much discretion. Well, you have a degree, you have a reasonable degree of discretion that's set forth in the policy, and I think that that's what's being exercised by Mr. Brown. Mr. Brown was not arguing that he could go outside the policy that was in place at the time. Your argument is discretion is not unbridled. It's absolutely not unbridled. This is not a situation, I think the work in Washington relies on the case out of Hawaii that your Honor wrote. There was unbridled discretion because the revocation of a permit could be made at any time for any reason. We're clearly not in that case. We have the term political, which I believe in itself would survive, but it's more than that. It's backed up by numerous examples of the types of activity that fall within the more general parameters. But the example, I mean, this is, I'm inclined, I mean, I don't hide these things. I'm inclined to go along with where Judge Kuhnauer is at the moment, but I do have to say that the example of political given in B is much narrower than what's at issue here. And political is, unless you confine it to things like actual campaign for a candidate or initiatives or, you know, things that are very specifically sort of on the public agenda with specific political actions or candidates on the table, if you're just talking generic political, that's actually kind of hard to define. And it's illustrated by your rejecting this ad and allowing the ad that wants infrastructure and good jobs. I mean, that's clearly a political decision as to whether or not you're going to spend money on political. It may not be controversial because people like infrastructure and they like jobs, and you don't have a clear adversary of some employer out there who, in your view, is not paying you enough money. But political is a very broad term. It could be, and I think in this case it's not, because, again, first of all, I do think the Sixth Circuit was right in recognizing that political is a objectively reasonable term that the decision maker is going to apply looking at the particular context at the time that the ad is put into place. So, in other words, what is political at one point in time may be different than what is political at another point in time, depending upon what the current area, you know, the current politics or controversy are in a particular area. Ask all those guys who put earmarks on to build bridges whether that's political. I'm sorry, what? Ask all those guys who put earmarks attached to statues to build bridges to nowhere whether that was a political act. If, as I said, in a particular context, we don't deny that there could be a particular context in which there is a political dispute about the bridge building, that maybe there was a particular bridge that was being debated down in Olympia and this was an ad to try to get people who were riding the subway to influence their representatives, that would be a different situation than the context of the bridge ad that was accepted. Well, that's the idea of B, I mean, the example you just gave. Right, well, I think the problem with the argument here is that the way the policy is structured is that B is both has independent force but it also helps inform the more general criteria restrictions that are in A, which is exactly what I think the courts would like agencies to do, that is to be as detailed as possible. The problem is B then does not become a gotcha, aha, we found a little loophole because, you know, this is a proposition but it's not being voted on by the people so it's okay under your effort to try to provide guidance. The basic policy which has been approved going back to the Lehman case, which is at issue here, is whether or not a tragedy agency in keeping in the context of a limited public forum, which is admitted and acknowledged for the purposes of this appeal, can maintain a position of neutrality on political and controversial issues. That premise goes back and has been adopted by Lehman, it's been adopted by numerous courts since in a limited public forum and that is what we are trying to apply and inform. And I think there's no doubt that this ad falls within the question of would it, it is advocating a particular position on an issue that is current and therefore it does undermine the ability of Sound Transit to maintain a position of neutrality. Step back just a little. Are you on A, are you relying on the political language in A or also the controversial language in A? We think that the court, the district court correctly ruled on the political. We do think it would be also sufficient under the controversial prong. But do you think that the political is your stronger argument? I think both are equally strong. I will acknowledge that in terms of the case law, political is a more accepted term. There is case law on controversial, as you talked about, the Lehman case, the DiLoretto case in the Ninth Circuit, the Cornelius case out of the Supreme Court, all recognize that controversial is an appropriate ground to reject access to a limited public forum. So we were relying on both arguments. We're here on appeal from a district court decision that we think was correct and he focused on the political. But the announced justification in the letter, for example, and all the internal correspondence relies on both. It relies on both. That's correct, Your Honor. Thank you. We'd ask that the district court be affirmed. Thank you, Your Honors. I'd like to address a few points that Sound Transit's counsel made. One, there is nothing in the record that indicates that Working Washington was engaged in any sort of actual political campaign addressing CTAC workers in the vein of restrictions that are brought up within Section 3.3B, no initiatives, no referendums, no proposed laws, nothing like that. There's nothing that progressed to the point of formal submission. But we do have, and apparently we didn't have the record cited to it, but we do have apparently from the Transit Authority a statement that suggests that this was an ongoing concern. I believe what's in the record is, and it's actually attached to counsel Paul Lawrence's declaration attached to this reply, are printouts of the website that Working Washington cites in its advertisement, which contains the same types of material that would be contained in Working Washington's website, which was cited in the Bridges ad. But specifically focusing on working conditions in the Transit Authority. Not necessarily conditions. It simply was raising awareness about low-wage earners at the airport. So that was ongoing. I mean, that was known. That's an ongoing campaign. That's part of the mission. And campaign might actually be the wrong word. It's an ongoing issue that they seek to raise awareness about, similar to how they sought to raise awareness regarding low-wage earners in the Bridge context when there was a significant amount of infrastructure reform happening. Second, I'd like to address the Sixth Circuit case, AFDI, American Freedom Defense Initiative versus SMART. That opinion is unhelpful to us for multiple reasons. Factually, it's very different. One, in that. It's unhelpful to you? Meaning it's harmful to you? No, helpful to actually understanding and making decisions regarding the entirety of this appeal. It's not helpful to defendants. It's not helpful to the analysis. You're not saying it's unhelpful to you. You're saying it's unhelpful to everybody. I believe so. I think it's very easily distinguishable. I just didn't want to misunderstand what you said. It is distinguishable from the issues at play in this appeal. One, the transit agency in AFDI did not bother to define the types of political speech that it sought to restrict in its form. It had a general bar on political and political campaign. And here we have a transit agency who took the opportunity to limit its form, and it created 18 specific definitions, detailed criteria of speech that it sought to exclude. So it's different on that. Two, we have comparator ads in the record here that show a differential treatment of Working Washington's ad in a way that was not present in AFDI. We have the Bridges ad, which is on the same subject matter as Working Washington's airport ad, but we also have a Planned Parenthood ad. Sound Transit also argued that, and I believe the district court agreed that, it could have excluded Working Washington's airport ad message because it didn't identify the sponsoring agency and because it didn't, the website content was not live at the time that the ad was submitted. And the Planned Parenthood ad had those same two flaws. So unlike AFDI, there's evidence in the record here already. Did those ads precede the promulgation of the policy? No. Both of them were under the same policy that the airport ad was. And so there's a Planned Parenthood ad that was accepted? I'm sorry, what was that? There was a Planned Parenthood ad that was accepted? That's correct. It's at ER 30. It was for? And it ran. Was it for? It promoted condom usage to prevent against sexually transmitted diseases and unwarranted pregnancies. May I ask one quick question? Please, please. I'm sorry, I just would like to know the fact of this and it would be useful. Was the bridges ad pertaining to bridges that Sound Transit was responsible for building or was it pertaining to bridges that were unrelated to Sound Transit's operations? Well, Your Honors, the bridges were as much under control as the airport is. The airport is run by the Port of Seattle and Sound Transit is an entirely different government entity. And the bridges were also not underneath Sound Transit's control. The bridges ad, Working Washington contracted with Sound Transit to ensure that the message, the bridges ad, was run in an area that was primarily, that was being affected by changes in the infrastructure and also that had a lot that the Sound Transit buses were used by blue-collar workers who also were very much affected by the decision to use low-wage earners or to pay them more. That answers my question. Thank you. Okay. Thank you. Thank both sides for your good arguments. Thank you, Your Honors. Working Washington versus Central Puget Sound Regional Transit Authority is now submitted for decision. That completes our argument for both this morning and for the week. Thank you very much. We're now adjourned. All rise.
judges: Ebel, Fletcher, Rawlinson